# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 17, 2022         Decided June 21, 2022

No. 21-5118

AIR TRANSPORT ASSOCIATION OF AMERICA, INC., DOING
BUSINESS AS AIRLINES FOR AMERICA AND INTERNATIONAL AIR
TRANSPORT ASSOCIATION,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00919)

———

*Anton Metlitsky* argued the cause for appellants. With him
on the briefs were *Benjamin G. Bradshaw*, *Bradley N. Garcia,*
and *Anna O. Mohan.*

*Leif Overvold*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were
*Brian M. Boynton*, Acting Assistant Attorney General, and
*Abby C. Wright*, Attorney.

Before: TATEL[*] and PILLARD, *Circuit Judges*; and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Appellants brought an action contesting a Department of Agriculture rulemaking in the district court. There, Appellants argued that the rule violated both the Food, Agriculture, Conservation, and Trade Act of 1990, as well as the Administrative Procedure Act. The district court granted summary judgment in favor of Appellees, and Appellants have appealed that decision to this Court. For the reasons stated herein, we affirm the district court's judgment in part, reverse it insofar as the challenged rule authorizes collecting fees to fund a reserve after 2002, and remand for proceedings consistent with this opinion.

## I.    Background

The Animal and Plant Health Inspection Service ("APHIS") is a federal agency, housed within the Department of Agriculture, responsible for administering the Agricultural Quarantine and Inspection Program ("Inspection Program"). Whenever an international air, rail, truck, or maritime shipment arrives at a United States port, APHIS may inspect the shipment, vessel, and any passengers for foreign animal and plant materials, pests, and diseases.

Originally, the Inspection Program was funded exclusively through congressional appropriations, but in 1990,

---

[*] Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

Congress enacted the Food, Agricultural, Conservation, and Trade Act ("FACT Act") of 1990. Pub. L. No. 101-624, § 2509, 104 Stat. 3359 (1990) (current version at 21 U.S.C. § 136a (2020)). The FACT Act provided for the Inspection Program to be, at least in part, funded by user fees rather than by appropriations.

When first enacted, the FACT Act authorized the Secretary of Agriculture to collect user fees for only one purpose: "to cover the cost of providing agricultural quarantine and inspection services . . . ." 21 U.S.C. § 136a(a)(1)(A) (1990). Congress modified the Secretary's authority to collect fees in 1996. Pub. L. 104-127, Title IX, § 917, Apr. 4, 1996, 110 Stat. 1187. Since then, the statute has authorized the Secretary to collect fees to cover three distinct costs. 21 U.S.C. § 136a(a)(1) (2020). First, the Secretary may collect fees "sufficient to cover the cost of providing agricultural quarantine and inspection services . . . ." § 136a(a)(1)(A). Second, the Secretary may collect fees "to cover the cost of administering this subsection." § 136a(a)(1)(B). Third, the Secretary, "through fiscal year 2002," is authorized to collect fees sufficient "to maintain a reasonable balance in the Agricultural Quarantine Inspection User Fee Account . . . ." § 136a(a)(1)(C).

In setting these fees, APHIS must "ensure that the amount of the fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees." § 136a(a)(2). "The costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft or other vehicle." *Id.*

Between 2007 and 2012, APHIS received criticism from the Inspectors General of the Departments of Homeland Security and Agriculture as well as the Government

Accountability Office that APHIS was not providing proper justification for its fees. In response to this criticism, APHIS retained Grant Thornton LLP, an audit, tax, and advisory firm, to develop a model to better align fees with costs.

In a 2012 Report, Grant Thornton proposed new fee levels for the various Inspection Program user classes. After publishing a proposed rule in 2014, APHIS adopted its final rule in 2015 increasing the Commercial Aircraft User Fee to $225 for commercial flights and reducing the Commercial Air Passenger Fee from $5 to $3.96. Notably, these fees were calculated in a way to fund not only the costs of the inspections, but also a reserve balance. In the Final Rule, eight user classes were exempted from paying any inspection fees at all.

On May 13, 2016, the Air Transport Association of America, Inc. and International Air Transport Association ("Appellants"), two air carrier trade associations, filed suit against the Department of Agriculture and its Secretary, APHIS and its administrator, the Department of Homeland Security and its Secretary, and Customs and Border Protection and its Commissioner (collectively referred to as "Appellees" or "APHIS") in the district court contesting the Final Rule under both the FACT Act and the Administrative Procedure Act. In Count I, Appellants asserted that APHIS exceeded its Authority under the Act and the APA by charging both a per-passenger and a per-aircraft fee to fund inspections of a single aircraft. In Count II, Appellants alleged that the Final Rule violated the FACT Act by imposing incommensurately high fees—the surplus from which allegedly cross-subsidized non-fee-paying exempt user class inspections—and violated the APA by failing to explain how the $225 Commercial Aircraft User Fee was "commensurate" with inspection costs, or necessary at all given the Commercial Air Passenger Fee. In Count III, Appellants alleged that the Final Rule's imposition

of a reserve surcharge exceeded the authority granted to the Secretary because the Act authorized a reserve charge until only 2002. Finally, in Count IV, Appellants alleged that the Final Rule violated the APA because APHIS withheld key information during the rulemaking.

APHIS responded, asserting, among other things, that despite the time limitation in 21 U.S.C. § 136a(a)(1)(C), it retained the authority to collect fees to fund a reserve under that subparagraph past fiscal year 2002. Ultimately, the district court granted summary judgment on Counts I, II, and IV in favor of Appellees. *Air Transp. Assoc. of Am., Inc. v. United States Dep't of Agric.*, 303 F. Supp. 3d 28, 57 (D.D.C. 2018). As for Count III, the district court held that due to the time limitation, subparagraph (a)(1)(C) does not authorize APHIS to collect fees to fund a reserve after fiscal year 2002 and granted summary judgment on Count III in favor of Appellants. *Id.* at 52. The district court then remanded the reserve surcharge portion of the rulemaking for further consideration and possible rulemaking by APHIS. *Id.* at 57.

On remand, APHIS issued a final interpretive rule insisting that even if it no longer had the authority to collect a reserve surcharge under § 136a(a)(1)(C), it retained the authority to collect a reserve surcharge under §§ 136a(a)(1)(A), (B). Appellants then amended their original complaint, challenging APHIS's new rationalization for collecting a reserve surcharge. Ultimately, the district court granted summary judgment in favor of Appellees, holding that subparagraphs (A) and (B) support APHIS's authority to collect a reserve surcharge despite the expiration of the explicit authorization to do so in subparagraph (C). *Air Transport Assoc. of Am., Inc. v. Dep't of Agric.*, Case No. 1:16-cv-00919-PLF, 2021 WL 1166928, at \*14 (D.D.C. March 26, 2021). Appellants timely appealed the district court's decisions to this Court.

We have jurisdiction over this appeal under 28 U.S.C. § 1291. We review the district court's grant of summary judgment *de novo*. *AquAlliance v. United States Bureau of Reclamation*, 856 F.3d 101, 104 (D.C. Cir. 2017).

## II.    Analysis

Appellants contest four aspects of the Final Rule: (1) that the collection of a reserve surcharge violates the FACT Act; (2) that the Final Rule violates the FACT Act's prohibition on cross-subsidization; (3) that the Final Rule violates the FACT Act and the APA by charging both a per-passenger and a per-aircraft fee on one aircraft; and (4) that APHIS violated the APA by withholding certain information during the rulemaking process.

### A.  The Reserve Surcharge

In its 1996 amendments to the FACT Act, Congress clarified when APHIS is permitted to collect user fees: (A) "to cover the cost of providing agricultural quarantine and inspection services"; (B) "to cover the cost of administering this subsection"; and (C) "through fiscal year 2002, to maintain a reasonable balance in the Agricultural Quarantine Inspection User Fee Account . . . ." §§ 136a(a)(1)(A)-(C). Appellants' argument regarding the reserve surcharge is quite simple: the authority to collect fees sufficient to maintain a reserve in § 136a(a)(1)(C) expired after fiscal year 2002, and therefore the Final Rule violates the FACT Act by continuing to do so. APHIS would have us read § 136a(a)(1)(C) in conjunction with §§ 136a(a)(5)-(6) to mean that between 1990 and 2002, Congress explicitly authorized APHIS to collect fees to maintain a reserve in the User Fee Account and that after 2002, Congress authorized APHIS to collect fees to maintain a

reserve in its own account by saying nothing at all. This blinks reality. The text's plain meaning and applicable canons of statutory construction support Appellants' reading of the statute.

Appellants' argument raises a question of statutory interpretation. We review an agency's interpretation of a statute using the familiar *Chevron* framework. *Chevron, U.S.A., Inc. v. Natural Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). In Step One of the *Chevron* analysis, we apply ordinary tools of statutory construction to determine "whether Congress has directly spoken to the precise question at issue." *Merck & Co., Inc. v. United States Dep't of Health & Human Servs.*, 962 F.3d 531, 535 (D.C. Cir. 2020) (citation omitted). Should we conclude that the statute does speak to the matter at hand, our analysis ends there. However, if the statute is ambiguous, we defer to an agency's interpretation of the statute so long as it is reasonable. *Id.* at 536.

In this case, the question at issue is whether the FACT Act authorizes APHIS to collect a reserve surcharge after fiscal year 2002. Appellants offer that Congress spoke to this issue in § 136a(a)(1)(C), where it stated that APHIS had the authority to collect fees to maintain a reserve "through fiscal year 2002." APHIS counters that subparagraph (a)(1)(C) functioned independently to specify the location for storing the reserve surcharge—the "Agricultural Inspection User Fee Account"— through 2002, rather than merely speaking to the authority to collect fees. Therefore, APHIS argues that Congress only limited the location for the surcharge funds after 2002 and not the agency's authority to collect them, and that we must defer to its interpretation of the FACT Act so long as it is reasonable.

APHIS contends that the authority to continue collecting a reserve fee after 2002 exists in subparagraphs (a)(1)(A)-(B)

and that (a)(1)(C) is of no consequence now that fiscal year 2002 has come and gone. But this reading of the statute conflicts with its plain meaning and violates the canon against surplusage. "It is a familiar canon of statutory construction that, 'if possible', we are to construe a statute so as to give effect to 'every clause and word.'" *Amoco Production Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Surplusage can significantly weaken a *Chevron* Step One argument. *See N.L.R.B. v. Fed. Labor Relations Auth.*, 952 F.2d 523, 532 (D.C. Cir. 1992).

Per APHIS's reading of the statute, its authority to collect a fee to fund a reserve in its account is included in the authority to collect fees covering the cost of providing services, § 136a(a)(1)(A), and "the cost of administering this subsection," § 136a(a)(1)(B). If we were to accept this reading, then APHIS would have always had, and will always have, the authority to collect fees to fund a reserve balance in its account unless the statute is amended to say otherwise. Were this the case, subparagraph (a)(1)(C), which explicitly limits APHIS's authority to collect fees to fund a reserve through fiscal year 2002, would be rendered meaningless.

APHIS's argument that subparagraph (a)(1)(C) merely specifies that the reserve will be housed in the Agricultural Quarantine Inspection User Fee Account ("the User Fee Account") through fiscal year 2002 does not rescue it from this death knell. Rather, §§ 136a(a)(5)-(6), which created and regulated the User Fee Account, provide further support to our, and therefore Appellants', reading of subparagraph (a)(1)(C). Subparagraph (a)(5) established the User Fee Account and provides that its funds were to be used "to cover the costs associated with the provision of agricultural quarantine and inspection services and the administration of this subsection"

through fiscal year 2002. § 136a(a)(5)(B). Subparagraph (a)(6) provides that after fiscal year 2002, all remaining funds in the User Fee Account were to be transferred to Department of Agriculture accounts that incur the costs of running the Inspection Program. § 136a(a)(6).

Congress spoke to the question of whether APHIS could collect fees to fund a reserve in subparagraph (a)(1)(C). It specified when APHIS was allowed to do so (through fiscal year 2002) and where that reserve should be housed (the User Fee Account). We will not read meaning into statutory silence when Congress has demonstrated that it is perfectly capable of delegating this authority to APHIS when it so chooses. *Accord D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Appellants' reading of the statute is further supported by the FACT Act's revision history. When originally enacted, the authority to collect fees to maintain a reasonable balance in the User Fee Account did not include the "through fiscal year 2002" limitation. Pub. L. 101-624, Title XXV, § 2509, Nov. 28, 1990, 104 Stat. at 4069, 4071. The time limitation was added to APHIS's authority to collect fees for maintaining a reserve in the 1996 amendments to the FACT Act. Pub. L. 104-127, Title IX, § 917, Apr. 4, 1996, 110 Stat. at 1187. That the time limitation was added to the statute after its original enactment supports the idea that Congress meant to sunset the authority it delegated to APHIS to collect fees to fund a reserve after fiscal year 2002.

Congress has directly addressed the question of whether APHIS may continue to collect fees to fund a reserve after fiscal year 2002. They may not do so. We will remand this case to the district court for vacating insofar as the Final Rule authorizes collecting fees to maintain a reserve account. Appellants' other arguments do not fare so well.

## B. The Aircraft Fees

Under the Final Rule, it is possible for inspections of a single aircraft to be funded by two different fees. The Commercial Aircraft User Fee is charged to all arriving international commercial aircraft with more than 64 seats. The Commercial Air Passenger Fee is charged to passengers arriving on international commercial aircraft. Commercial aircraft are subject to the Commercial Aircraft User Fee regardless of whether a particular flight is carrying cargo.

Appellants contend that charging both fees to the same arriving aircraft violates the FACT Act's requirement that APHIS "ensure that the amount of [Inspection Program] fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees," 21 U.S.C. § 136a(a)(2), because "[t]he costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft or other vehicle," *id.* APHIS argues that this challenge to the Final Rule is time barred, as it comes more than "six years after the right of action first accrue[d]." 28 U.S.C. § 2401(a). But since the time bar is non-jurisdictional and does not change our conclusion, we need not address it. *See Jackson v. Modly*, 949 F.3d 763, 778 (D.C. Cir. 2020) ("[W]e hold that § 2401(a)'s time bar is nonjurisdictional and subject to equitable tolling."). Therefore, we proceed to the merits of this argument.

### 1. The Costs of "Related" Inspections

Section 136a(a)(2) requires that APHIS "ensure that the amount of [Inspection Program] fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees." 21 U.S.C. § 136a(a)(2). Further, "[t]he costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft or other vehicle." *Id.*

Our review of agency statutory interpretation, like the reserve fee issue above, is governed by the *Chevron* framework. First, we look to whether Congress has directly addressed the question at issue in the statute. If it has not, we defer to an agency's interpretation of the statute so long as it is reasonable. *Chevron, U.S.A., Inc. v. Natural Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984).

Appellants contend that Congress has spoken precisely to the issue of whether a single aircraft may be subject to both fees in the statute and that the analysis should conclude at *Chevron* Step One. We agree that the analysis concludes at *Chevron* Step One, but we disagree with Appellants' ultimate conclusion.

The construction of this statute hinges on the word "related" in § 136a(a)(2)'s "[t]he costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft or other vehicle." Appellants aver that because the section requires that passengers be responsible for the costs of "related inspections of the aircraft," those passengers are responsible for the costs of inspecting the entire aircraft. But this reading of the statute would give no meaning to the word "related" in the statute. Appellants' reading would not change if "related" were deleted from the statute.

As above, we "construe a statute so as to give effect to 'every clause and word.'" *Amoco Production Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). We will not interpret a statute to be read the same way regardless of whether a substantive term is included in the reading. In this statute, "related" performs an important narrowing function. "Related" is defined as "[c]onnected by reason of an established or discoverable relation," *Related*, def. 1, *Merriam-Webster's Unabridged Dictionary* (2022), and "[c]onnected in some way; having relationship to or with something else," *Related*, *Black's Law Dictionary* (11th ed. 2019).

The inclusion of "related" in the statute clearly limits which inspections commercial air passengers are responsible for funding. This statute does not say that they are responsible for the costs of the inspection of the entire aircraft; they are responsible for the costs of inspections related to themselves and their presence on the aircraft. This is further supported by the use of the plural "inspections" in the statute. 21 U.S.C. § 136a(a)(2). Clearly, Congress contemplated that a single aircraft could undergo multiple inspections and would not necessarily be subject to one single inspection paid for by one single user class. Congress has spoken to the question of whether APHIS may charge different user classes for different inspections of a single vehicle, and therefore our analysis of whether the application of both fees violates the FACT Act ends here. However, even if the statute were ambiguous, APHIS's interpretation of the statute is reasonable, and Appellants' challenge of the application of both fees would fail at Chevron Step Two as well.

## 2. The Application of Both Fees and the APA

Appellants further contend that the imposition of a Commercial Aircraft User Fee on aircraft with passengers paying a Commercial Air Passenger Fee is arbitrary and capricious because the Grant Thornton analysis did not support the imposition of both fees and APHIS failed to explain why it deviated from this recommendation. We will hold an agency action unlawful and set it aside when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In rulemaking, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

### a. The Grant Thornton Analysis

According to Appellants, APHIS acted arbitrarily and capriciously because the reports prepared by Grant Thornton, which were relied upon in establishing the Final Rule, assumed that individual aircraft would be assessed only the Commercial Air Passenger Fee if they carried passengers, and APHIS neither acknowledged this nor explained why it rejected this assumption in the Final Rule. However, no explanation was necessary because Appellants misconstrue the Grant Thornton reports. Appellants' argument emphasizes statements throughout the Grant Thornton reports that appear to indicate that the Commercial Air Passenger Fee would cover the cost of inspecting the entirety of the aircraft. JA 510; JA 373–74; JA 356. However, as argued by APHIS and found by the district court, these statements and distinctions do not tell the entire story. Grant Thornton's calculations of fee amounts clearly

presume that APHIS will continue funding inspections of arriving aircraft by charging both the Commercial Aircraft User Fee and the Commercial Air Passenger Fee. APHIS relied on this methodology when promulgating the Final Rule.

The Final Rule bears this out. In both the Grant Thornton documentation and the Final Rule, the Commercial Aircraft User Fee was calculated by dividing the total costs of inspecting Commercial Aircraft by the total number of Commercial Aircraft (cargo-only and aircraft with passengers). *See* JA 471–72 (Grant Thornton Model Documentation stating that there were 139,798 cargo-only aircraft and 517,629 commercial aircraft in Fiscal Year 2010 totaling 657,427 total aircraft); JA 244 (Final Rule listing costs and calculating the Commercial Aircraft User Fee based on 657,427 aircraft in Fiscal Year 2010). Had Grant Thornton included only the 139,798 cargo-only aircraft in its calculation of the Commercial Aircraft User Fee, its proposed fee would have been hundreds of dollars higher than the $225 fee it did propose.

All of Appellants' arguments regarding the dual application of the Commercial Aircraft User Fee and the Commercial Air Passenger Fee fail.

### C. Cross-subsidization

Appellants further argue that the Final Rule violates the FACT Act by permitting two forms of unlawful cross-subsidization. First, Appellants claim that the Final Rule overcharges certain user classes to pay for the inspections of user classes that are exempt from being charged for inspections. Second, Appellants contend that APHIS is improperly comingling fees collected from various user classes

into a single account that funds the inspections of all user classes.

Appellants' ground their cross-subsidization arguments in the FACT Act's "commensurate" requirement. Per the FACT Act, APHIS must "ensure that the amount of the fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees." 21 U.S.C. § 136a(a)(2). The district court concluded that APHIS had not engaged in any "cross-subsidization" that would violate this requirement. *Air Transp. Assoc. of Am., Inc. v. United States Dep't of Agric.*, 303 F. Supp. 3d 28, 52–54 (D.D.C. 2018). First, the court found no violation where APHIS provided fee-exempt inspections to certain user classes because those inspections were paid for by appropriations. *Id.* at 52–53. Second, the court held that APHIS could fund inspections for fee-paying user classes from an account that comingled fees collected from multiple user classes so long as "the fees *charged*" were commensurate to costs because the FACT Act "instructs the Secretary on how to set the fees, not how to use [them]." *Id.* at 53; *see id.* at 53–54. Appellants challenge both of those conclusions, and APHIS defends them.

There are eight user classes of the Inspection Program that are exempt from paying any fees at all. These are private vehicles, pedestrians, buses, private vessels, private aircraft, military inspections, rail passengers, and passenger aircraft with 64 or fewer seats. While all are subject to the same inspections as other Inspection Program users, they are not required to pay for the service. APHIS offers that the inspections for these exempted user classes are funded through congressional appropriations.

Appellants have two overarching arguments about that form of alleged cross-subsidization. First, Appellants aver that any reliance on appropriations violates Congress's intent that the Inspection Program be self-funded through user fees rather than through appropriations. Second, they argue that the record does not support that any supposed appropriations cover the costs of the inspections for exempted user classes. But these arguments rely on a distorted interpretation of the FACT Act and cannot succeed.

Appellants argue that the use of appropriations to fund inspections of the exempt user classes is contrary to the FACT Act because it prohibits the use of appropriations to fund the Inspection Program. This is not the case. There is no language in the Act that prohibits APHIS from funding parts of the Inspection Program via appropriations. The FACT Act provides that APHIS "*may* prescribe and collect fees . . . ." 21 U.S.C. § 136a(a)(1) (emphasis added). There is no requirement in the FACT Act that APHIS actually do so, and therefore, certainly no requirement that APHIS cover all of its costs through user fees.

Further, the record demonstrates that no such cross-subsidization is occurring. According to the record before us, the cost of providing inspection services to the exempted user classes makes up approximately 24% of all Inspection Program costs. Appellant Opening Br. 47 (citing JA 17–18, 237). Per APHIS's Regulatory Impact & Final Regulatory Flexibility Analysis, appropriations were expected to cover up to 30% of total inspection costs. JA 149. Therefore, the funds received through appropriations are more than sufficient to cover the costs of inspecting the exempted user classes.

Appellants' argument that APHIS may not comingle funds collected from various user classes into a single account fails

as well. The statute does not include any prohibition on funds collected from one user class being used to fund inspections of another fee-paying user class. The section containing the "commensurate" language is a limitation on how much can be collected in fees from a particular user class. It is not a limitation on how those fees may be spent. Therefore, Appellants' argument that fees collected from multiple user classes cannot be comingled in a fund that pays for the inspections of fee-paying user classes fails because the FACT Act does not prohibit this form of cross-subsidization. The district court reached this same conclusion. *Air Transp.*, 303 F. Supp. 3d at 53–54.

### D. The Withheld Information

Appellants' final argument is that APHIS violated the APA by relying on unreleased information. Specifically, Appellants contend that APHIS violated the APA by withholding underlying Grant Thornton fee model documentation that was central to its analysis and the Final Rule.

The APA requires that "interested persons" have "an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). We have interpreted this requirement to mean that an agency must make "at least the most critical factual material that is used to support the agency's position on review" public. *Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984). "[A]n agency cannot rest a rule on data that, in critical degree, is known only to the agency." *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001). To succeed on this argument, Appellants must demonstrate that

they were prejudiced by the withholding of this data. They do not need to prove that their comments would have changed the terms of the Final Rule, only that they "had something useful to say about this critical data." *Chamber of Commerce v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006). But if Appellants cannot produce "substantive challenges which differ in kind from the original comments," then no harm has occurred. *Florida Power & Light Co. v. United States*, 846 F.2d 765, 772 (D.C. Cir. 1988).

Appellants contend that they were denied a meaningful chance to comment on the rulemaking because APHIS did not release the underlying Grant Thornton fee model documentation, JA 304–496, and cost output data, AR 656–69780, before promulgating the Final Rule. According to Appellants, this additional information would have further supported their position that Grant Thornton did include the costs of inspecting the entire aircraft in its calculation of the Commercial Air Passenger Fee, which we held not to be the case above.

In this case, after receiving the withheld information, Appellants have provided no arguments substantively different from their original arguments. Appellants argue that they would have been able to further support their arguments that APHIS violated the APA in the Final Rule by applying the Commercial Aircraft User Fee and the Commercial Air Passenger fee to arriving passenger aircraft. But Appellants point to the information that they were denied only once in their brief. Appellant Br. 42. Appellants use this information merely to provide additional support for their argument that Grant Thornton always intended for the Commercial Air Passenger Fee to cover the costs of inspecting the entire aircraft. This is not substantively different than the arguments made prior to their receipt of this information.

Appellants have not shown a harm from the withholding of this data. Therefore, the failure to release the requested data prior to the promulgation of the Final Rule did not violate the APA.

**III.    Conclusion**

For the reasons stated above, we affirm the district court's judgment in part, reverse it insofar as the challenged rule authorizes collecting fees to fund a reserve after 2002, and remand for proceedings consistent with this opinion.